MEMORANDUM AND ORDER
 

 OWEN, District Judge.
 

 Plaintiff ImOn Inc. moves for a preliminary injunction against defendants Imagi-nOn, Inc. Both parties are suppliers of “services or products” on the Internet which, as I recognize and grapple with hereafter, is one of the most fluid, rapidly developing, and virtually daily changing areas of commerce that the law has had to focus upon and endeavor to apply established principles to. Plaintiff alleges that it has the sole right to use the “IMON” mark and defendant’s use of the mark constitutes trademark infringement, unfair practices, and unfair competition. For the reasons below, I decline to grant the preliminary injunction.
 

 Defendant ImaginOn has been using “IMON” in one form or another since January 1999. At that time, it adopted IMON as its NASDAQ stock “ticker” symbol. Each press release issued by ImaginOn after that date identified IMON as Imagi-nOn’s NASDAQ symbol. In June 1999, ImaginOn acquired the
 
 www.vmon.com,
 
 domain name. On July 15, 1999, ImaginOn announced that it would be introducing a high-bandwidth “portal” product to be found at its
 
 www.imon.com
 
 Internet website. That 'high-bandwidth portal product eventually changed from being a portal into the IMON.COMTV software product hereafter described, and every press release since November 23, 1999, has described the software product IMON. COMTV as allowing the broadcast of Internet television and not as a portal.
 

 
 *347
 
 ImaginOn’s product, introduced in October of 1999, and called IMON.COMTV, is essentially a packaged Internet television delivery tool and is marketed as a “TV station in a box.” IMON.COMTV is a “licensed turnkey [software] package that enables any website to present interactive television within a standard browser window on any suitably connected computer.” IMON.COMTV packages a number of Im-aginOn’s propriety technology products in one place, and is meant to be customized only with an individual customer’s “logo, colors, website links, and more” and with no reference to IMON.COMTV.
 

 IMON.COMTV is not marketed to the average Internet user: startup costs begin at $31,000 (plus an additional $4000 or more for a host computer server), with additional “hosting” costs that begin at $7,600 per month. The IMON.COMTV product allows ImaginOn customers to create and broadcast in their own name alone their audio-video content over the Internet, and to enhance that content by allowing viewers to “click”on different areas of the video and immediately be connected to corresponding e-commerce pages. The customers control all the content displayed on their website through IMON.COMTV supplied software. Apparently, what is unique about this program is that the video may be viewed without actually being downloaded into the viewer’s computer. The video at all times remains on the Internet. Also provided with the IMON. COMTV product are video authoring and automated web research tools. The video authoring tool helps ImaginOn customers convert existing video into interactive digital video for use with the IMON.COMTV product. The web research tool, Imagi-nOn’s Webzinger, allows IMON.COMTV viewers to search the Internet while viewing digital video feeds. Defendant’s “product” is a software package that would be customized to each purchaser. Through this software, the purchaser would be allowed to show videos on their website and would maintain links to ImaginOn’s other products.
 

 Turning to plaintiff, ImOn, Inc. was originally incorporated as Surf Fever, Inc. on May 6, 1999. Sometime in June plaintiff retained outside counsel to search for potential domain names registrable in the United States Patent and Trademark Office (USPTO). On or about June 23, 1999, plaintiff learned that IMON was a possible name. Plaintiff then targeted the domain names IMON and I AM ON. The next day on June 24, 1999, plaintiff requested Thomson & Thomson, an international trademark and copyright search firm, to provide a common law search on imon.com or iamon.com relating to an Internet service provider, retail sales over the Internet, search engine, and advertising services. Thomson & Thomson responded the same day faxing 31 pages to Ms. Ruth-man, plaintiffs in-house counsel. On or about that day, Ms. Ruthman, visited the
 
 wwvj.imon.com
 
 and noted that it was the website for the North American Cracid Taxonomic Advisory Group, featuring endangered birds. However, within a week, Ms. Ruthman learned that
 
 www.imon.com
 
 had been purchased by ImaginOn.
 

 Apparently, someone from Surf Fever contacted Kristine Miller, a trademark attorney for the law firm Tucker Flyer located in Washington, D.C. on or before June 29, 1999, and requested her to assist Surf Fever in determining the ownership of
 
 vjww.imon.com
 
 and
 
 wvjw.imon.net.
 
 In turn, Ms. Miller retained James Moy that same day to investigate the owners of these two domain names. Though Mr. Moy claims that he prepared a report and responded to Ms. Miller by June 30, 1999, the contents of that report concerns events occurring on July 7. Clearly Mr. Moy’s report as exhibited could not have been forwarded to Ms. Miller until July 7, 1999, at the earliest. As part of Mr. Moy’s investigation, he visited the site
 
 www. imon.net. The
 
 first page of which displayed the following: “Your high speed Internet service provider serving Southern Pennsylvania and coming soon to your
 
 *348
 
 neighborhood.” There was also an advertisement for hair, nail, and skin care and links
 
 [1]
 
 to RolhngStone.com and deja.com. Another page on that website indicated that there had been 91 visitors to the site. On June 30,1999, Mr. Moy spoke with Mr. Rick Sundermier, the owner of
 
 www. imon.net,
 
 learned that Mr. Sundermier “did not have any services or products called Tmon,’ ” and asked Mr. Sundermier to consider selling the domain name to him. At this time, Mr. Moy knew only that he was negotiating for an undisclosed principal. Mr. Sundermier said he would think about the offer. Mr. Moy also learned that Mr. Sundermier had incorporated Imon.net, Inc. under the laws of Pennsylvania as recently as June 25, 1999. Presumably, Ms. Miller forwarded this information to Surf Fever.
 

 Despite being aware of Sundermier’s corporation and website offering high speed Internet service, on July 13, 1999, two weeks after plaintiff learned that Im-aginOn had purchased
 
 www.imon.com
 
 and two days before ImaginOn announced its intention to launch a high bandwidth portal on
 
 wvyw.imon.com
 
 and 4 weeks before Moy bought
 
 wvm.imon.net,
 
 Surf Fever filed an application to register in the United States Patent and Trademark Office (USPTO) the mark IMON with regard to Internet services, indicating on the application that it intended to use the mark in commerce. I observe, and. of this more later, that the application requires the applicant to sign a declaration which states that
 

 he/she believes the applicant to be entitled to use such mark in commerce; to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the above identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive.
 

 Also following that application, on July 22,1999, Surf Fever requested Thomson & Thomson to provide a state corporate name search for the mark IMON. On July 28, 1999, Thomson & Thomson responded and indicated that Imon.net, Inc. was a Pennsylvania corporation.
 

 Sometime between June 30, 1999 and July 28, 1999, Mr. Moy received instructions from Ms. Miller to buy the domain name
 
 www.imon.net
 
 from Mr. Sundermier. Mr. Moy negotiated with Mr. Sunder-mier in early August and on August 11, 1999, contracted for the assignment and sale of rights, title, and interest in the
 
 www.imon.net
 
 domain name. Mr. Sunder-mier also assigned to Mr. Moy the right to sue for past infringement of the name. Two days before this sale, on August 9, 1999, Surf Fever amended its certificate of incorporation to change its name to ImOn, Inc. Apparently through oversight, Mr. Moy never transferred the rights in the name to ImOn, Inc. until December 21, 1999, when Mr. Moy and ImOn, Inc. executed a contract stating that the effective date of the transfer is August 11, 1999. Thus, the
 
 vmw.imon.net
 
 site appeared to the world to be Mr. Moy’s until December 21, 1999, since it was registered to him.
 

 Plaintiff ImOn, Inc. has a business strategy of being a business-to-business marketer of Internet access and portal services. As Mr. Farber, Imon’s acting president, extensively testified, they market to two levels of customers. The first level customer is big business corporations. ImOn offers that customer the “product” of Internet access. Its marketing plan is to allow big business corporations the ability to offer to its customers free Internet access through ImOn. ImOn’s plan is to become affiliated with these big corporations and tie into their marketing stream. Such corporations
 
 *349
 
 would offer to its customers free Internet access as an added benefit, for example, after purchasing $50.00 worth of goods or visiting the store a certain number of times or whatever. ImOn might offer its access software through the big corporation’s mailings or by handing it out in a store. ImOn’s second level of customers are that big corporation’s customers. Once that corporation’s customers logon to the Internet through ImOn, they would be brought to an opening page which would exhibit the logos of both ImOn and the name of that large business. That opening page would also include some that big corporation’s advertisements. In addition, that page would also be a portal page containing a search engine, news, advertising, and e-commerce. ImOn would not charge a fee to the large business or its customers, but ImOn’s plans are to earn revenue through the banner advertisements displayed at the bottom ImOn’s co-branded portal screen and the e-commerce trade generated. E-commeree trade refers to business generated when a customer purchases a product from a website after obtaining access to that site by a direct link from another site, and the portal that created the access to the company from which an individual made a purchase is compensated with a commission. So ImOn would make money through commissions and after a certain number of people had viewed the banner advertisements. Aside from the customers gained through ImOn’s affiliation with large businesses, ImOn expects to have visitors to their website solely for purposes of using ImOn’s portal services. Through these visitors, ImOn also expects to earn money through e-commerce commissions or because they viewed a banner advertisement. Plaintiffs “product” is basically a service agreement or contract with a partner to give Internet access and portal services to that partner’s customers.
 

 Against this factual background, plaintiff asserts that its and defendant’s marks are identical, both plaintiffs and defendant’s services are competitive, and the services are delivered through similar channels, namely, the Internet. Plaintiff therefore argues that consumers are likely to be confused, and that plaintiff is entitled to a preliminary injunction.
 

 The purpose of a preliminary injunction is “to keep the parties while the suit is goes on, as far as possible in the respective positions they occupied when the suit began” and to preserve the court’s ability to render a meaningful decision after a trial on the merits.
 
 WarnerVision Entertainment v. Empire of Carolina, Inc.,
 
 101 F.3d 259, 261-62 (2d Cir.1996). A preliminary injunction is an extraordinary and drastic measure that should not be routinely granted,
 
 Mazurek v. Armstrong, 520
 
 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997), because it is “one of the most drastic tools in the arsenal of judicial remedies.”
 
 Hanson Trust PLC v. SCM Corp.,
 
 774 F.2d 47, 60 (2d Cir.1985). The granting of a preliminary injunction is within the equitable discretion of the trial judge.
 
 Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander’s Dep’t Stores, Inc.,
 
 299 F.2d 33 (2d Cir.1962).
 

 Prior to discussing the standards for a preliminary injunction, I must observe some grave concerns about the weight and effect that plaintiff feels should be accorded its trademark application. Plaintiff argues that it has priority of use regarding the IMON mark because it applied to the USPTO on July 13, 1999, for a trademark on that name, and because it then has the right to tack on to that date the time in which Mr. Sundermier owned
 
 ioww. imon.net
 
 and portrayed it as an Internet service provider. However, even assuming that Mr. Moy’s December 21, 1999, transfer can be deemed effective as of August 11, 1999, plaintiff filed its trademark application approximately one month before Mr. Moy on its behalf acquired any rights in the IMON mark and also approximately one month before Surf Fever changed its name to ImOn, Inc. The result
 
 *350
 
 is that plaintiff is in the awkward situation of arguing to this Court that it should have the ability to claim priority as of July 13 and to tack on Mr. Sundermier’s time, although without any entitlement or ownership rights, it represented to the USPTO that it did have such and to its knowledge and belief, that no other person, firm, corporation, or association had the right to use the IMON mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive. While I express no opinion regarding the validity of this application,
 
 Ohio State Univ. v. Ohio Univ.,
 
 51 U.S.P.Q.2d 1289, 1293 (Trademark Trial and Appeal Board, 1999), I do not find, however, for the purposes of this preliminary injunction, that the plaintiff can use this application for a July 13, 1999, priority date. That said,— and even without that being said— there is a real question as to whether plaintiff or defendant has priority to this mark.
 

 In order to obtain a preliminary injunction, a plaintiff must demonstrate both (1) that it will suffer irreparable harm if the motion is not granted and (2) either (a) a likelihood that it will succeed on the merits of the action or (b) a sufficiently serious question going to the merits of the litigation and the balance of hardships tipping decidedly in plaintiffs favor. . L.
 
 & J.G. Stickley, Inc. v. Canal Dover Furniture Co.,
 
 79 F.3d 258, 261-62 (2d Cir.1996).
 

 On the subject of irreparable harm, plaintiff argues that the Court should presume irreparable injury because of the difficulty of remedying confusion in the marketplace by an award of damages. Plaintiff cites
 
 Marcy Playground, Inc. v. Capitol Records, Inc.,
 
 6 F.Supp.2d 277 (S.D.N.Y.1998), for this proposition. However, as stated in
 
 Many Playground,
 
 any presumption of irreparable harm “is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunction.”
 
 Id.
 
 at 281. Delay in seeking a preliminary injunction “tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement.”
 
 Citibank,
 
 N.A
 
 v. Citytrust,
 
 756 F.2d 273, 276 (2d Cir.1985). Plaintiff admits that it was aware of ImaginOn’s alleged use of the IMON mark as early as late September 1999. Yet plaintiff did not file this suit until January 20, 2000 and even then did not file the motion for a preliminary injunction until the first week of February, a total delay for this motion of approximately eighteen weeks. While I do not base my denial of the preliminary injunction on plaintiffs delay, I do find that the presumption of irreparable harm is not operative here and the balance of hardship test clearly favors the defendant. Since I conclude find that there is little likelihood of confusion, discussed hereafter, I also believe that plaintiff will not be irreparably harmed in the legally-actionable sense.
 

 Plaintiffs likelihood of success on the merits also depends upon its ability to demonstrate that “defendant’s use of [plaintiffs mark] is likely to cause confusion.”
 
 Time, Inc. v. Petersen Pub’g Co. L.L.C.,
 
 173 F.3d 113, 117 (2d Cir.1999). Plaintiff argues that defendant causes two kinds of likelihood of confusion: forward confusion and reverse confusion. Forward confusion is the misimpression that the senior user of a mark is the source of the junior user’s services or goods.
 
 Banff Ltd. v. Federated Dep’t Stores, Inc.,
 
 841 F.2d 486, 490 (2d Cir.1988). Reverse confusion is the misrepresentation that the junior user is the source of senior us,er’s goods or services. Both types of confusion may be the basis of injunctive relief under 43(a) of the Lanham Act.
 

 To determine whether there is a likelihood of confusion between the marks, the Court addresses the factors defined in
 
 Polaroid Corp. v. Polarad Electronics Corp.,
 
 287 F.2d 492 (2d Cir.1961):(1)
 
 *351
 
 strength of the senior user’s mark; (2) degree of similarity between the marks; (3) proximity of the products; (4) likelihood that senior user will bridge the gap; (5) actual confusion; (6) junior user’s good faith in adopting its own mark; (7) quality of junior user’s product; (8) sophistication of the buyers. However, the “eight-factor list is not exclusive.”
 
 Paddington Corp. v. Attiki Importers & Distrib., Inc.,
 
 996 F.2d 577, 584 (2d Cir.1993). This is not a mechanical process whereby the party with the greatest number of factors in its favor prevails.
 
 Id.
 
 Instead, the Court must ultimately focus on the overriding question of whether consumers are likely to be confused.
 
 Id.
 

 Plaintiffs papers assert that its “IMON” mark is a strong mark because it is either fanciful or suggestive and because the USPTO examining attorney must have found the mark fanciful or suggestive since he did not reject the application. Even accepting that assertion, plaintiff only answers half the question. The strength of a mark must also be determined with reference to its commercial context.
 
 Centaur Communications, Ltd. v. A/S/M Communications, Inc.,
 
 830 F.2d 1217, 1225-26 (2d Cir.1987). “[A] mark may be conceptually strong and yet commercially weak if the mark lacks the requisite ‘origin-indicating’ quality in the eyes of consumers.”
 
 Sunenblick v. Harrell,
 
 895 F.Supp. 616, 626 (S.D.N.Y.1995). While secondary meaning is not a required showing with every type of mark, evidence of this “secondary meaning is always relevant to assessing the strength of the mark under the
 
 Polaroid
 
 test.”
 
 Id,.
 
 In evaluating the existence of secondary meaning, courts in this Circuit look to six factors: (1) the senior user’s advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user’s sales success; (4) third party uses and attempts to plagiarize the mark; (5) length and exclusivity of the mark’s use; (6) unsolicited media coverage of the products at issue.
 
 Thompson Med. Co. v. Pfizer, Inc.,
 
 753 F.2d 208 (2d Cir.1985).
 

 Plaintiff spent $3,750 for marketing materials from July through December 1999. Plaintiff claims that figure only represents “out-source” marketing materials, and that the payroll figure also represents marketing since it is usually done in-house by the three payroll employees. Plaintiff has produced no customer studies linking IMON to ImOn, Inc. Plaintiff has only one customer and is presently in the process of setting up a portal program for that customer. Plaintiff has not submitted to the Court any information on unsolicited media coverage of its service nor any information on third party uses or attempts to plagiarize the mark. Since the IMON mark was not used by either party in any form prior to January of 1999, its use is not long. Accordingly, I find that the IMON mark is not a strong mark, and plaintiffs counsel in summation did not seem to disagree.
 

 Turning to the second factor, I disagree with plaintiffs contention that the marks are identical. Though plaintiff has evidence that defendant’s
 
 www.imon.com
 
 site labeled itself as IMON.com as recently as December 29,1999, all of defendant’s press releases since November 23, 1999, call the software product IMON.comTV or ImOn. comTV. Moreover, all the present promotional information presented to the Court indicate that the defendant is calling its product ImOn.comTV, and all of the declarations and memoranda submitted call the product IMON.COMTV. Regardless of the capitalization, I find that defendant’s mark is not the plaintiffs IMON mark.
 

 To the extent that the names are similar, the ultimate question “is whether that similarity is likely to generate confusion among potential consumers.”
 
 Sunenblick,
 
 895 F.Supp. at 628. “Since the similarity between trademarks has different implications depending upon whether or not the products are competitive, it is proper to consider the issue of similarity in conjunc
 
 *352
 
 tion with the third factor, the proximity of the products.”
 
 Id.
 
 I will discuss the issue of similarity along with the proximity of the products.
 

 Plaintiff argues that -the defendant offers the same services as plaintiff, portal services and dial-up services, and that defendant’s services are therefore competitive with plaintiffs services. However, it is quite clear from the evidence presented that defendant is not using IMON.COMTV nor its Internet site, www.imon.com, for Internet dial-up access. This leaves portal services as the only possible overlap.
 

 For purposes of this preliminary injunction motion, a portal may be considered a gateway to the World Wide Web. It may be, though not necessarily, the starting page or first page a user comes to after accessing the Internet. This page usually contains a search engine,
 
 [2]
 
 news, stock quotes, advertisements, and direct links to particular businesses, commonly known as e-commerce. The search engine is a hierarchical, topical directory of thousands of other web sites. The user by entering a search term can be linked to such hundreds or thousands of sites that contain the subject matter searched. On the other hand, I find that a website does not itself become a portal just because it is linked to a portal. Such a website .does not contain the essential portal element of a directory and links to thousands of other sites which make a portal a gateway to the World Wide Web, it being dependant upon getting to a separate website for such a function.
 

 Plaintiff plans to offer and is offering through
 
 www.imon.snap.com
 
 portal services. These services include a search engine, news, advertisement, and e-commerce. Defendant offers none of these services at its
 
 wvm.imon.com
 
 site. Additionally, IMON.COMTV is not a portal in and of itself. Its primary marketing aspect is that it gives the website owner the ability to show videos over the Internet under the owner’s name alone. It also allows that owner to choose the advertising displayed on the site and from that to establish direct links to other businesses for e-commerce. While the IMON. COMTV software program comes with links to ImaginOn’s other proprietary programs, including Webzinger, which allows a search of the Internet to be conducted, I do not believe that this link converts the entire program into a portal so as to be competitive with the plaintiffs portal services.
 

 Moreover, there is no possible confusion between plaintiffs and defendant’s products to the group of plaintiffs customers who are every day Internet users looking for portal services or who are given access and portal service by plaintiff. Plaintiffs customers who are given access and portal services are brought directly to plaintiffs website. Thus there is no real possibility that the members of this group will end up on defendant’s website. For those customers looking for plaintiffs portal services, they will immediately know that whatever defendant’s site is, it is not a portal. When an Internet user goes to the
 
 www.imon.com,
 
 he or she will see advertising for the IMON.COMTV software, which starts at approximately $30,000. On that site there is no functioning portal service whatever. Additionally, if the user goes to one of defendant’s customer’s sites, i.e., someone that has purchased IMON. COMTV and set it up on their own website at their own address, there will be no appearance whatsoever of the name IMON.COMTV on that site. ImaginOn customizes their IMON.COMTV software package to that website owning customer. Only that customer’s logos, advertisements, and desired links for e-commerce or whatever else will be displayed. That customer earns the revenue from advertisements and e-commerce. ImaginOn has
 
 *353
 
 nothing further to do with the site once it sells the customer the IMON.COMTV software unless that customer requests some type of servicing or hosting by Imag-inOn. There is no proximity of products with regard to these customers.
 

 Plaintiff, observing that both plaintiff and defendant are competing for big corporate customers, argues that the customers will be confused by the similarity in the names of the two products. Applicable here is another of the
 
 Polaroid
 
 factors, the sophistication of the purchasers. “The more sophisticated the consumers of a product are, the less likely it is that similarities in tradedress or trademarks will result in confusion concerning the source or sponsorship of the product.”
 
 Paddington Corp.,
 
 996 F.2d at 587 (internal quotations omitted). Before a corporate customer purchases defendant’s product
 
 for
 
 $80,000 or, alternatively, contracts with plaintiff putting its reputation and goodwill at risk, that corporate customer will most assuredly inquire as to nature of each product or service, and thus keep its “IMONs” straight.
 
 Mountain Road Properties, Inc. v. Battaini,
 
 806 F.Supp. 498, 501 (D.Vt.1992). I do not find in these circumstances that a sophisticated corporate customer will be confused by any similarity in the names of these two products.
 

 Plaintiff contends that confusion exists and points to two e-mails and a potential customer’s confusion as proof. “For purposes of the Lanham Act, actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another.”
 
 Sports Auth., Inc. v. Prime Hospitality Corp.,
 
 89 F.3d 955, 963 (2d Cir.1996) (quotations omitted). While evidence of actual confusion is a strong indication that a likelihood of confusion exists, it is not necessary to show actual confusion in order to establish a likelihood of confusion under the Lanham Act.
 
 Conopco, Inc. v. Cosmair, Inc.,
 
 49 F.Supp.2d 242, 252 (S.D.N.Y.1999). “Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user.”
 
 Lang v. Retirement Living Publ’g Co.,
 
 949 F.2d 576, 583 (2d Cir.1991).
 

 This case is, however, not a passing-off case, and in closing argument plaintiff’s counsel voluntarily so acknowledged. There is no evidence of a consumer purchasing one product thinking it was the product of the other. A perusal of the two e-mails reveals that the authors were inquiring as to whether plaintiff was associated with defendant. There is no evidence that these individuals were plaintiff’s customers or potential customers for whom the Lanham Act was designed to protect. Moreover, these e-mails do not represent evidence of reverse confusion, which would be indicated by a customer erroneously believing that defendant is the source of plaintiffs products. Plaintiff also points to a situation where a potential customer was confused after visiting defendant’s
 
 www. imon.com
 
 instead of plaintiffs
 
 www. imon.net
 
 as an example of confusion. Without elaborating, plaintiff claims it “just raised questions” in the potential customer’s mind. I think that anytime a person visits a wrong website, in which the information on the site does not correspond to the presentation given, questions are going to be raised. I do not find that the above come close to supporting a finding of a likelihood of confusion.
 

 Since the quality of defendant’s product has not been question, and since sophistication of the buyer was addressed previously, I will examine the last factor, defendant’s good faith in adopting its mark. Here, the Court must determine whether “the defendant adopted its mark with the intention of capitalizing on plaintiffs reputation and goodwill and any confusion between his and the senior user’s product.”
 
 Lang,
 
 949 F.2d at 583. Because a junior user has prior knowledge of a senior user’s trademark, an inference of bad faith does not necessarily arise, and such situation may be entirely consistent with good faith.
 
 *354
 

 Sports Auth,
 
 89 F.3d at 964. I find no evidence of bad faith. Plaintiff, as a start-up, had no reputation or. goodwill for defendant to capitalize on. Moreover, it appears defendant proceeded on the reasonable belief that its product was different.
 

 Balancing the
 
 Polaroid
 
 factors, I find they weigh strongly in favor of the defendant. Accordingly, as detailed above, plaintiff has not made the required showing, and its motion for a preliminary injunction is denied.
 

 The foregoing is so ordered.
 

 [1]
 

 . A hyperlink is highlighted text or images that when selected by the user, permits him to view another related document within the same site or actually go to another website.
 

 [2]
 

 . This is essentially a space where the user can type in what is being sought (for example "snow shoes") and can thereafter be linked to what possible suppliers the search finds (see, infra).