**TOY MANUFACTURERS OF AMERICA, INC., Plaintiff,**

v.

**HELMSLEY–SPEAR, INC., Fifth Avenue Building Associates, and 200 Fifth Avenue Associates, Defendants.**

No. 97 Civ. 0180 (SAS).

United States District Court, S.D. New York.

Feb. 11, 1997.

---

674

Susan Progoff, Cynthia Johnson, Keith Agisim, Fish & Neave, New York City, for Plaintiff.

John M. Calimafde, Hopgood, Calimafde, Kalil & Judlowe, L.L.P., New York City, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff alleges, *inter alia*, that defendants have engaged in conduct in violation of Section 43(a) of the Lanham Act and New York's unfair competition law,[1] and move for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Specifically, plaintiff now asks this Court to (1) enjoin defendants' "security" registration procedure currently taking place in the lobby of 200 Fifth Avenue (the "Toy Center"); (2) to prohibit defendants from making incorrect or misleading statements regarding plaintiff's registration procedure; and (3) to order defendants to cease conducting the Second Annual Toy Import and Christmas Show.[2] For the reasons set forth below, plaintiff's motion is partially granted.

### I. Procedural Background

After reviewing plaintiff's legal memoranda and affidavits, and hearing oral argument on January 29, 1997, I issued a Temporary Restraining Order ("TRO") and scheduled an evidentiary hearing for February 7, 1997. Both plaintiff and defendants produced evidence at the hearing, and made supplementary oral argument regarding the legal issues arising from this case. An Amended TRO was issued on February 7, 1997.

---

1. Plaintiff brings its claims under both New York General Business Law § 368–d and the common law of unfair competition.

2. This is the relief plaintiff requested at the close of oral argument, which differs slightly from the relief requested in plaintiff's original pleadings.

## II. Factual Background

### A. TMA and TOY FAIR

Plaintiff Toy Manufacturers of America ("TMA") is a not-for-profit corporation founded in 1916 as a trade association for United States producers and importers of toys, Christmas ornaments and holiday decorations. TMA's membership consists of nearly 300 manufacturers and importers of toys, including all of the major American companies in the toy business, as well as design firms and toy testing laboratories. TMA promotes toy safety standards throughout the world and is active in educating consumers about toys and toy safety. In addition, TMA engages in numerous educational and charitable activities. See Affidavit of David A. Miller, President of TMA, sworn to on January 27, 1997 ("Miller Aff.") at ¶ 3.

Since 1902, the toy industry has held an annual trade show known variously as "Toy Fair", "the New York Toy Fair", the "American Toy Fair" and "the American International Toy Fair" ("TOY FAIR"). TMA has been the sole sponsor and organizer of this event since 1931. See Miller Aff. ¶ 4. For more than sixty years, TOY FAIR has been held in New York City in early February. Continuously since 1934, TOY FAIR has been held at the building located at the Toy Center, along with other buildings in the surrounding neighborhood. As TOY FAIR expanded, many other sites have been added, including, most recently, the Jacob K. Javits Convention Center, which TMA is committed to use for TOY FAIR at least through the year 2000. See Miller Aff. ¶ 5.

TOY FAIR is widely advertised and promoted both domestically and internationally in the consumer and trade press through TMA's mailings to the toy industry and through extensive unpaid publicity that TOY FAIR receives each year through articles and stories that appear in the electronic and print media. Plaintiff alleges that it expends approximately $400,000 annually on advertisements and publicity for the American International Toy Fair. See Miller Aff. ¶¶ 7–9.

As a result of TMA's efforts and reflecting the dominant position of the American toy industry worldwide, TOY FAIR has become one of the premier toy show in the global toy industry. In 1996, more than 1600 exhibitors participated in TOY FAIR and more than 20,000 buyers and 10,000 other registrants, such as inventors, licensors and manufacturers' representatives, attended TOY FAIR. See Miller Aff. ¶ 10. Plaintiff claims this event contributed more than $180 million to the economy of New York City in 1996. See Affidavit of Doreen Guerin, Marketing Director of TMA, ("Guerin Aff."), sworn to on January 27, 1997, at ¶ 19.

TMA conducts a screening procedure before it registers buyer attendees for TOY FAIR. The purpose of this procedure is to ensure the TOY FAIR exhibitors that buyer attendees are in fact in the toy business. As a result of TMA's qualification procedure, TMA has developed a list of more than 20,000 buyers from 99 countries. This list includes specialized information about the buyers' operations and needs that is not available to the public or the trade and could not be easily reconstructed from public information. For a fee, TMA will provide a narrowly tailored sub-set of this confidential list to registered TOY FAIR exhibitors shortly before TOY FAIR so that they can contact potential buyers in advance.[3] These lists are provided in the form of pre-printed labels so that they can be used only once, and are prominently marked "One Time Use Only—Confidential." See Miller Aff. ¶ 11; Guerin Aff. ¶¶ 7–9. This list also serves as a basis for soliciting the appropriate buyers to participate in future TMA events, including TOY FAIR. See Guerin Aff. ¶ 9.

### B. Defendants' Activities

Defendants Fifth Avenue Building Associates and 200 Fifth Avenue Associates own the International Toy Center located at 200 Fifth Avenue and 1107 Broadway, New York,

---

3. Only the names of those who pre-register are sold; the names of those who register on-site are never sold. Approximately 10,000 of the 20,000 attendees of the American International Toy Fair pre-register. The names of the 10,000 "other registrants" such as inventors, licensors, and manufacturers' representatives are never sold.

New York. These buildings are managed by defendant, Helmsley–Spear, Inc. *See* Miller Aff. ¶ 13. More than ninety percent of the tenants in the Toy Center buildings are in the toy business.

In February, 1996, defendants organized and sponsored a trade show, known as the "Toy Import and Christmas Show". The first show was held the week preceding TMA's 1996 American International Toy Fair. Defendant's show was not advertised and no registration was required.[4] The Second Annual Toy Import and Christmas Show began on February 6, 1997 and runs through February 16, 1997. Defendants have not advertised the show, although they did send mailings to some buyers and exhibitors. Despite this minimal effort, defendants received "security badge registration forms" from approximately 14,000 buyer-attendees.

TMA is a tenant in 200 Fifth Avenue and has been involved in negotiations with defendants over the renewal of its lease, which expires in April 1997. Those negotiations have now broken down. After the breakdown of the negotiations, defendants announced that, for the first time in the more than sixty years that TOY FAIR registration has been held at 200 Fifth Avenue, TMA was not permitted to register TOY FAIR attendees in the lobby of that building. *See* Miller Aff. ¶ 15; Guerin Aff. ¶ 11. As a result, TMA arranged to conduct registration for TOY FAIR in a heated tent erected on the north side of Madison Square Park. *See* Miller Aff. ¶ 15; Guerin Aff. ¶ 11.

In addition, defendants announced that, "for security reasons," they will require that all persons seeking to visit showrooms in the International Toy Center during TOY FAIR register with the building before they will be allowed access to exhibitors whose show-rooms are located in those buildings. *See* Miller Aff. ¶ 16; Guerin Aff. 1 12. Defendants also concede that they are using the "security" registration process to create a list of buyers who may wish to attend fairs that defendants are sponsoring or intend to sponsor in the future.[5] Defendants admit that they now intend to sponsor such fairs in order to attract business for their tenants.

Registration has been conducted on defendants' behalf by Expo Registration, Inc.. *See* Guerin Aff. ¶ 12. The "security" registration applications that defendants distributed look substantially the same as TMA's registration applications for TOY FAIR 1996, and seek the same detailed marketing information that is requested on TMA's TOY FAIR pre-registration forms. *Compare* Plaintiff's Exhibit 2 (1996 TOY FAIR Registration Application) with Plaintiff's Exhibit 1 (defendants' 1997 "security badge registration form").[6] Defendants have conducted their registration in the same location and in substantially the same manner that TMA has used for more than half a century to conduct TOY FAIR registration and to distribute TOY FAIR directories. *See* Miller Aff. ¶ 16; Guerin Aff. ¶ 15.

The TRO issued on January 29, 1997 and the Amended TRO issued on February 7, 1997, enjoined defendants from using the term TOY FAIR in the Toy Center lobby, and from using any "security" registration form that requested information beyond the name, address and similar information of entrants to the Toy Center. The Amended TRO required signs to be posted to clarify that the defendants' security registration process was not sponsored by plaintiff. The same signs indicated that TOY FAIR attendees were required to register with TMA

---

**4.** Defendants did send "limited edition" invitations for their first show to several hundred buyers. *See* Defendant's Exhibit 4.

**5.** The "security" aspect of defendants' registration procedures is, in fact, a pretext for obtaining a list of attendees. As is clear from plaintiff's Exhibit 100 (floor map of Toy Center lobby), entrants to the Toy Center could go directly to the elevators without registering for a security badge or showing a badge. Three days after the Second Annual Toy Important and Christmas

Show began, defendants posted security guards at the elevators.

**6.** Defendants' "security badge registration form" states "To obtain security badges by mail, your form must be received by January 24, 1997. Final registration cutoff is January 28, 1997. All forms must be received by this date." This form was *sent to* buyers whose names were obtained from defendants' tenants. Defendants have already received approximately 14,000 completed forms in the mail.

even if they had already obtained a security badge from defendants.[7]

## III. Applicable Legal Standards

### A. Standard for Preliminary Injunction

In order to obtain preliminary injunctive relief under the established law of this Circuit, the moving party must show:

(a) the possibility of irreparable injury, and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of the hardships tipping decidedly toward the party requesting injunctive relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons. Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (*per curiam*).

■ The element of irreparable injury is established in the trademark context "where there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 66 (2d Cir.1985). *See also Standard & Poor's Corp. v. Commodity Exchange*, 683 F.2d 704, 708 (2d Cir. 1982) ("In the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm").

### B. Plaintiff's Lanham Act Claim

■ Plaintiff's primary claim is under Section 43(a) of the Lanham Act, which prohibits the use of:

any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin ... likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association ... with another person, or as to the origin sponsorship, or approval of his or her goods, services, or commercial activities by another person....

15 U.S.C. § 1125(a)(1). Section 43(a) guards against infringement of unregistered marks and other indicia of origin, including trade dress and trade names. *See e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (unregistered marks and trade dress), *reh'g denied*, 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992); *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 582 (2d Cir.1993); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991) (trade dress); *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576 (2d Cir.1991) (trade name). To prevail on its trademark infringement claims under 43(a), TMA must show: (1) that it has a valid mark subject to protection; and (2) that defendant's mark and/or dress results in a likelihood of confusion. *See Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993); *Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 992–93 (2d Cir.1987); *Corning Glass Works v. Jeannette Glass Co.*, 308 F.Supp. 1321, 1325 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir.1970).

■ A now-familiar, nonexclusive list of eight factors, articulated by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), structures the inquiry into likelihood of confusion. These factors are: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the competitive proximity of the products or services; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap" between the two markets; (6) the defendant's good faith in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of purchasers. *Id.* at 495. *See The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996). This test applies to both competing and non-competing goods or services. *Banff, Ltd. v. Federated Dept., Stores, Inc.*, 841 F.2d 486 (2d Cir.1988). A

---

7. The Amended TRO required a sign to be posted at each entrance to the Toy Center that stated: "If you already have a building security badge, you may enter building without further security registration. A security badge is not a substitute for American International Toy Fair registration in tent in Madison Square Park on Fifth Avenue."

court's evaluation of the *Polaroid* factors should not be mechanical, nor is any single factor determinative. *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983). Rather, a court "should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp.,* 996 F.2d at 584 (citing *Lang* 949 F.2d at 580). In answering that "ultimate question," a court may find infringement has occurred based on confusion that creates initial customer interest, even if no final sale is completed as a result. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 260 (2d Cir.1987) (likelihood that defendant would gain "crucial credibility" during initial phase of purchase justifies finding of infringement).

### C. Plaintiff's New York Common Law Claim

Plaintiff also alleges that defendants' conduct violates the "misappropriation" branch of the New York common law of unfair competition. As the Second Circuit summarized,

> [T]his amorphous cause of action has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor and misappropriating for the commercial advantage of one person ... a benefit or property right belonging to another.

*Standard & Poor's Corp.,* 683 F.2d at 710 (citations and quotations omitted).[8]

New York has codified the common law of unfair competition in the "Anti-dilution Act", which states in pertinent part:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of

a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

New York General Business Law § 368–d (" § 368–d").

## IV. Discussion

### A. Lanham Act Claim

█ A threshold issue in determining the merits of plaintiff's Lanham Act claim is whether plaintiff's trade dress may be protected under § 43(a). *See Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985). "Trade dress is the totality of elements in which a product or service is packaged or presented. These elements combine to create the whole visual image presented to customers and are capable of acquiring exclusive legal rights as a type of identifying symbol of origin." 1 J. Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* ("McCarthy") (1996) § 8:1 at 8–2. Trade dress protection focuses on the plaintiff's "entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 613 (9th Cir.1989). The concept of "trade dress" is an expansive one, and has been held to include such things as the decor, menu and style of a restaurant,[9] and even the distinctive performing style of a rock music group.[10] *See generally,* 1 McCarthy § 8:4 at 8–9 to 8–11 (listing cases and other examples of protectible trade dresses such as book cover, appearance of a teddy bear, the shape of a classic car, the combination of features on a folding table, and the appearance of a bathroom scale).

---

**8.** Plaintiff also argues that defendants have misappropriated a "trade secret" by obtaining plaintiff's list of TOY FAIR attendees through their "security" registration process. However, the list of attendees defendants have acquired through the "security" registration process is not the same as plaintiff's list. Thus, while plaintiff may have an unfair competition claim based on an injury to business reputation and good will, plaintiff may not base its unfair competition action on a misappropriation of trade secret theory.

**9.** *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615, *reh'g denied,* 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992).

**10.** *Cesare v. Work,* 36 Ohio App.3d 26, 520 N.E.2d 586 (1987).

■ I find there is a sufficiently serious question with regard to whether plaintiff has established a TOY FAIR trade dress that may be protected under § 43(a) to make it a fair ground for litigation. Without question, the organizers of an event may seek to protect the mark by which their services in providing that event have come to be recognized by the public. *See, e.g., International Olympic Committee v. San Francisco Arts & Athletics,* 781 F.2d 733 (9th Cir.1986) (Olympic sporting event), *aff'd,* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987); *Louisiana World Exposition, Inc. v. Logue,* 746 F.2d 1033 (5th Cir.1984) (world fair). The more difficult question is whether the organizers of an event may protect the "trade dress" of the event rather than a particular "trade mark".

I recognize that the "trade dress" concept may not be stretched infinitely to give exclusive rights to a vague and abstract image or marketing theme of a service or product. To do so would leave defendants and other potential competitors unsure as to how to avoid violation of the Lanham Act, and thus create dangers of anti-competitive over-protection. Yet in a factual context highly similar to the one presented by this case, a Colorado Court of Appeals found that a trade fair sponsor could protect a "trade show organized and promoted in a specific manner, held at a specific location on specific dates, and frequented by specific buyers and exhibitors." *Heller v. Lexton–Ancira Real Estate Fund, Ltd.,* 809 P.2d 1016, 1020 (Colo.Ct.App.1990), *rev'd on other grounds,* 826 P.2d 819 (Colo. 1992) [11] There is an abundance of evidence in the record to suggest that attendees have come to recognize TOY FAIR by the combination of features which taken together may constitute a trade dress — the name, the date, the location and the registration process.

■ Therefore, to prevail on its trade dress claim under Section 43(a) TMA must show (1) that its trade dress is distinctive, and (2) a likelihood of confusion between its trade dress and that of defendants. *See*

*Paddington,* 996 F.2d at 582. Trade dress is subject to protection if it is inherently distinctive, or if it has acquired secondary meaning in the minds of the consuming public. *Id.* The distinctiveness of trade dress is divided into four categories, from least to most distinctive: 1) generic; 2) descriptive; 3) suggestive; or 4) arbitrary and fanciful. *Id.* at 583; *Abercrombie,* 537 F.2d at 9. Arbitrary and fanciful trade dress is considered to be inherently distinctive, and is subject to protection without further proof of secondary meaning. *Paddington,* 996 F.2d at 583.

■ Plaintiff's trade dress is not generic; as noted above, TOY FAIR has a unique combination of features, including but not limited to its name, date, the distinctive registration process, location, and the color and design of plaintiff's registration forms. I need not further categorize plaintiff's trade dress in terms of its distinctiveness, however, because I find that its trade dress has achieved secondary meaning in the minds of the public. TMA has held TOY FAIR registration in the lobby of the Toy Center for over sixty years. *See* Miller Aff. ¶ 5. The record indicates that TOY FAIR attendees have come to expect to register for TOY FAIR in the lobby of the Toy Center. This is a sufficient basis to find that the location, time and manner of TOY FAIR registration has acquired enough distinctiveness or secondary meaning to function as a significant indication of a particular sponsor.

■ I now turn to a discussion of each of the *Polaroid* factors. The first is the strength of TMA's, which is measured in large part by "the distinctiveness of the [dress], or more precisely, its tendency to identify goods sold under the [dress] as emanating from a particular ... source." *See McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). I have found that plaintiff's dress is distinctive because it has achieved secondary meaning in the minds of the public; TOY FAIR attendees expect to

11. *Heller* was decided under the Colorado Consumer Protection Act, § 6–1–101, et seq., C.R.S. (1973 Vol. 2), which, like § 43(a) of the Lanham Act, provides a cause of action for passing off and reverse passing off, as does the Lanham Act.

*See John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 325 (E.D.Pa.1976), *aff'd in part and rev'd in part sub. nom., Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir.1978).

register for TOY FAIR in the location and in the manner which TOY FAIR has used for sixty years. While the strength of plaintiff's dress is not overwhelming, it nevertheless weighs slightly in plaintiff's favor.

■ The second *Polaroid* factor is the similarity of the plaintiff's dress to defendants' dress. When comparing trade dress to determine the likelihood of consumer confusion, "the correct test is whether a consumer who is somewhat familiar with the plaintiff's [dress] would likely be confused when presented with defendant's [dress] alone." *See Direct Marketing of Va., Inc. v. E. Mishan & Sons, Inc.,* 753 F.Supp. 100, 106 (S.D.N.Y.1990). There is substantial evidence that defendants' "security" registration procedure is sufficiently similar to plaintiff's to create real confusion among TOY FAIR attendees. As noted above, I have already found the "security badge registration form" was misleadingly similar to plaintiff's 1996 pre-registration form. Additionally, I note that defendants' 1997 Official International Toy Center Directory —— available free of charge upon entry to the Toy Center —— contains a letter from Mayor Giuliani welcoming attendees to TOY FAIR, not to the Second Annual Toy Import and Christmas Show. *See* Plaintiff's Exhibit 16. The record indicates that buyers who called to ask whether the security registration procedure was sponsored by plaintiff were given misleading or incorrect information. *See, e.g.,* Affidavit of Daniel Shure ("Shure Aff."), President of Strombecker Corporation, at ¶ 3; *see generally* Testimony of Investigator Moy, David Miller and Doreen Guerin. Defendants have made material available in the Toy Center lobby that constantly refers to TOY FAIR, not defendants' fair. *See* Plaintiff's Exhibits 123–126. Finally, before signs were placed in the Toy Center lobby pursuant to the January 29, 1997 TRO, there was no clear indication that the security registration process was not sponsored by plaintiff. Considering the totality of the circumstance, I find the similarity of defendants' "security" registration procedure to plaintiff's previous registration procedure weighs heavily towards a finding of likelihood of confusion.

The third and fourth factors to consider are the proximity of the services offered and whether plaintiff and defendants are likely to compete directly in the same market. I need not expend too much energy discussing these issues here, as Mr. Thomas S. Arbuckle (the general manager of the Toy Center and sole witness for defendants) stated repeatedly during the preliminary injunction hearing that he believes plaintiff and defendants are now in direct competition. Although defendants made some effort to distinguish their trade show from TOY FAIR based on the manner in which purchases are made at the two fairs, Mr. Arbuckle also conceded that he believed the same buyers would attend both shows. I therefore find that both these factors militate in plaintiff's favor.

■ The fifth *Polaroid* factor focuses on whether defendants acted in good faith. The relevant inquiry is whether defendants established the "security" registration procedure "with the intention of capitalizing on [the] plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang,* 949 F.2d at 583. The second comer has a duty to name and dress its services so as to avoid likelihood of confusion with the senior user's services, *see Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 953 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982), and evidence of intentional copying raises a presumption that the second comer intended to create a confusing similarity. *See Paddington,* 996 F.2d at 586–87. In particular, defendants' decision to move their competing trade show from a week before the 1996 TOY FAIR to the same dates as the 1997 TOY FAIR is strong evidence that defendants planned to capitalize on the confusion of TOY FAIR attendees to develop their buyers list through the so-called "security" registration process. That defendants designed their "security badge registration form" to mimic plaintiff's pre-registration form, and failed voluntarily to place signs in the Toy Center lobby to clarify that plaintiff had not sponsored the "security" registration process, only compounds the inference that defendants acted in bad faith. I therefore find this factor also weighs in favor of plaintiff.

The sixth factor is the existence of any *actual* confusion as to origin or sponsorship. Plaintiffs have presented some evidence that TOY FAIR attendees and exhibitors have been, and continue to be, confused as to who is responsible for the "security" registration in the lobby, and whether attendees are required to register with both plaintiff and defendants. *See, e.g.,* Shure Aff. ¶ 3; Miller Aff. ¶ 16. Because actual confusion as to sponsorship is strong evidence of the likelihood of potential confusion, this factor also weighs against defendants.

The seventh *Polaroid* factor to consider is the quality of the offered services. Courts in this Circuit have held that a "lack of marked difference in quality between goods supports the inference that they emanate from the same source." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1228 (2d Cir.1987). The parties appear to agree, however, that defendants' trade show is newer and smaller than TOY FAIR and has not yet developed a reputation in the industry. This factor weighs against a finding that defendants' competing show has created a likelihood of confusion.

■ The eighth factor focuses on the sophistication of the consumers who attend TOY FAIR. Likelihood of confusion "must be assessed by examining the level of sophistication of the relevant purchasers" of plaintiff's and defendants' services. *See Sports Authority, Inc.,* 89 F.3d at 965 (quotations omitted). This inquiry is to be made by considering the "general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Id.* (quotations omitted). The parties, perhaps out of deference to the clientele they plan to invite to future trade shows, agree that most TOY FAIR attendees are reasonably sophisticated in terms of the toy industry. It is noteworthy that many attendees are from foreign countries and are not native English speakers. However, plaintiff's expert witness testified that there is a high likelihood of confusion as to sponsorship whenever similar trade shows are held in close physical proximity and at the same time, irrespective of

how sophisticated the trade show attendees may be in their respective fields of business. Because these shows are held in the *same* building on overlapping dates, and defendants are requiring registration in the *same lobby* where plaintiff's registration has been held for almost sixty years, the sophistication of the buyers becomes irrelevant.

In conclusion, I find that the first six *Polaroid* factors weigh in favor of finding that defendants' conduct creates a likelihood of confusion, with particular importance going to the second factor (similarity of services). The seventh factor weighs against such a finding, and the eighth plays a neutral role in the analysis. My analysis of all the *Polaroid* factors therefore leads me to find that defendants' "security" registration procedure has created a likelihood of confusion as to sponsorship of TOY FAIR.

B. Unfair Competition Claim

■ While the Lanham Act may cover defendants' alleged misconduct, the gravamen of plaintiff's complaint falls squarely within the ambit of New York's law of unfair competition. Indeed, plaintiff's stronger theories may be the state law claims. New York statutory and common law justifies injunctive relief for conduct specifically designed to capitalize on another's initiative and good will. *See* N.Y. General Business Law § 368–d; *Bristol–Myers Co. v. Picker,* 302 N.Y. 61, 70, 96 N.E.2d 177 (1950); *Adirondack Appliance Repair, Inc. v. Adirondack Appliance Parts, Inc.,* 148 A.D.2d 796, 538 N.Y.S.2d 118, 120 (3d Dep't 1989); *Pocket Books, Inc. v. Meyers,* 265 A.D. 17, 37 N.Y.S.2d 596 (1st Dep't 1942), *aff'd,* 292 N.Y. 58, 54 N.E.2d 6 (1944). *See generally Restatement of the Law of Unfair Competition (3d)* § 3 (1993) (definition of "commercial detriment" includes harm to good will).

A review of the facts laid out above underscores the persuasiveness of plaintiff's unfair competition claim. The record indicates that defendants failed to notify plaintiff that it would not permit TOY FAIR to use the Toy Center lobby to register attendees until shortly before TOY FAIR was to begin. It is undisputed that defendants moved the date of their competing trade show to coincide

with TOY FAIR. I have already found that defendants' "security" registration form, sent to many TOY FAIR attendees, was misleadingly similar to plaintiff's 1996 pre-registration forms. Defendants included a welcoming letter to TOY FAIR attendees from the Mayor in their own Toy Center directory without clarification that defendants were not sponsoring TOY FAIR. The "security" registration procedures closely replicate those used in past years by plaintiff, and defendants originally took no steps to avoid confusion on the part of attendees as to the procedures required to register for TOY FAIR. Defendants made no effort to advertise their show this year, relying instead on the fact that TOY FAIR had already brought thousands of attendees to the Toy Center.

These facts lead to but one reasonable inference: defendants hoped to utilize the good will and reputation of TOY FAIR to their advantage by capitalizing on the confusion likely to be caused by instituting a registration procedure strikingly similar to that used by plaintiff for almost sixty years. In the process, defendants have created a situation in which plaintiff is no longer able to control its own reputation. TOY FAIR attendees, disgruntled at the prospect of waiting on two registration lines rather than just one, will undoubtedly blame TMA for the inconvenience. The record shows that TOY FAIR registration has markedly decreased from last year, a fact that I can only attribute to (1) confusion as to whether defendants' registration is in fact plaintiff's registration, or (2) an unwillingness to register twice because of the extra time and effort that would require; or (3) some combination of the two.

Any of the three explanations leads to the conclusion that defendants' scheme has reduced the number of TOY FAIR registrants, and probably caused confusion as to sponsorship and undermined TOY FAIR's good will in the process. This is precisely the type of commercial misconduct that the law of unfair competition is designed to prevent. *See, e.g., W.W.W. Pharmaceutical Co., Inc. v. Gillette Co.,* 984 F.2d 567, 576 (2d Cir.1993) (citing *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162, 1165–66 (1977) (discussing claim for harm to business reputation under § 368–d)). I therefore conclude that § 368–d and New York's common law of unfair competition provide an independent basis for granting injunctive relief in this case.

## C. Relief Granted

Plaintiff has established that injunctive relief is appropriate under the Lanham Act and New York law with regard to defendants' "security" registration process.[12] It is also appropriate to enjoin defendants from inaccurately informing TOY FAIR attendees that they need not register with TMA to attend TOY FAIR. It is unnecessary, however, to enjoin defendants from conducting the Second Annual Toy Import and Christmas Show. It is not defendants' show itself that provides the basis for plaintiff's Lanham Act and New York claims, but rather the manner in which defendants decided to stage their show this year. To the extent that defendants' show can compete with TOY FAIR without misleading the public as to the sponsorship of the two trade shows, or detracting from TOY FAIR's good will or TMA's reputation, it is a welcome competitor to the field.

## V. Conclusion

For the foregoing reasons, I find that defendants' security registration procedures have caused and are likely to continue to cause confusion as to sponsorship of TOY FAIR and harm to TOY FAIR's good will and reputation. Accordingly, it is hereby

ORDERED that defendants, their officers, agents, servants, employees and attorneys,

---

12. Defendants assert that, as the owners and managers of the Toy Center, they have a right to require all invitees of their tenants to register before entry. This argument, however, misses the mark. It is well-established that "[i]n fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 390 (5th Cir.1977). *See generally* 4 McCarthy § 30:4 at 30–11 (explaining courts have power to enjoin "an act, which if done alone could be legal, but when performed in the context of a totality of acts does constitute unfair competition").

and all persons acting in active concert or participation with any of them, are preliminarily enjoined and restrained from using, circulating, printing or otherwise distributing any form of registration in the lobby of the Toy Center; and it is furthermore

ORDERED that defendants, their officers, agents, servants, employees and attorneys, and all persons acting in active concert or participation with any of them, must disgorge any and all information regarding buyers, exhibitors, or any other attendees, obtained by use of the "security badge registration form" or through the "security" registration that has taken place in the lobby of Toy Center; and it is also

ORDERED that defendants, their officers, agents, servants, employees and attorneys, and all persons acting in active concert or participation with any of them, are preliminarily enjoined and restrained from making any representation that any attendees of TOY FAIR need not register in the American International Toy Fair registration tent in Madison Square.

SO ORDERED.