**TOUGH TRAVELER, LTD., Plaintiff,**

**v.**

**OUTBOUND PRODUCTS, Taymor Industries U.S.A., Inc., and Taymor Industries, Ltd., Defendants.**

No. 94–CV–0449 (LEK/RWS).

United States District Court,
N.D. New York.

Dec. 1, 1997.

counsel, Cohen, Dax Law Firm, Albany, NY, Paul R. Rapp, of counsel, for plaintiff.

Gleason, Dunn Law Firm, Albany, NY, Mark T. Walsh, of counsel, Sutton, Basseches Law Firm, New York City, Barry G. Magidoff, of counsel, for defendants.

## MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

### I. Introduction

Plaintiff, Tough Traveler, Ltd., designs and manufactures child carriers—essentially a backpack-type apparatus for carrying children. On April 7, 1994, plaintiff filed a complaint, alleging claims for infringement of trade dress under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unfair competition under New York common law. Specifically, plaintiff alleged that defendants Outbound Products, Taymor Industries U.S.A., Inc. and Taymor Industries, Ltd. (collectively "defendants") had copied plaintiff's product, the "Kid Carrier," "caus[ing] cheaper, inferior, and confusingly similar child carriers to be manufactured abroad ... [and selling] the Outbound carriers in the United States in competition with Tough Traveler." *See Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 966 (2d Cir.1995). This Court .(Cholakis, J.) granted plaintiff's motion for preliminary injunction, defendants appealed and the Second Circuit vacated the injunction, finding the presumption of irreparable injury in this case negated by the fact that plaintiff had waited at least nine months after discovering the competing product before filing a complaint, and had delayed another four months before moving for a preliminary injunction. *See id.* at 968.

Defendants now move for summary judgment on both plaintiff's trade dress infringement claim under § 43(a) of the Lanham Act and plaintiff's claim of unfair competition under New York law. Plaintiff has cross-moved for summary judgment on its unfair competition claim. For the reasons that follow, defendants' motion is granted and plaintiff's motion is denied.

Honen, Wood Law Firm, Albany, NY, Richard E. Honen, Charles R. Hyslop, of

## II. Background

Plaintiff Tough Traveler, a New York corporation, has been manufacturing and selling the Kid Carrier since 1985. The carrier is designed to be "capable of carrying a baby on a person's back during a long hike ... while keeping both the baby and adult comfortable." Affidavit of Nancy Gold Establishing Secondary Meaning And/Or Distinctiveness of Plaintiff's Child Carrier ("Gold Aff.") at ¶ 4. The carrier is not protected by a patent or copyright.

Defendant Taymor Ltd. ("Taymor") is a Canadian corporation; Outbound Canada is a division of Taymor, and Taymor Industries U.S.A. is a wholly-owned subsidiary of Taymor. Taymor began selling child carriers in 1984; it does not actually manufacture the child carriers it sells. Zalkow Depo. 110–11, 61–62. Defendants' Outbound 27–750, also referred to as a "Toddler Tote," is the allegedly infringing child carrier. It was first sold in Canada in 1991, and was introduced into the United States in 1992 or 1993.

Plaintiff's complaint alleges that the Kid Carrier's design features are "clearly identified by the purchasing public as products of Tough Traveler," and claims that the design features are protected against infringement on trademark principles. Compl., ¶¶ 7, 14, 15. Plaintiff's complaint describes its design features as "including [the padded stripe, the diagonally oriented zipper, the side 'wings' with the straps bisecting them, the seat of the carrier, the 'toy loops', the frame including a design for a 'kickstand'], the silhouette, profile and size of the carrier, size and placement of the elements of the carrier, the canvas strap construction and color contrasts, the component layout and stitching pattern, the design, the configuration and placement of hardware, and other design aspects combin[ing] to give the Carrier an inherently and aesthetically distinctive, original and arbitrary appearance...." Compl., ¶¶ 11, 12.

Defendants sent a Tough Traveler Kid Carrier to its manufacturer prior to the introduction of its "Toddler Tote" 27–750. Zalkow Dep. at 139. Plaintiff asserts that the Kid Carrier was sent to defendants' manufacturer to be duplicated (Zalkow Depo. 269, 272 and Pl.Exh. 1); defendants assert that the Kid Carrier was sent to the manufacturer as a sample of functional elements Taymor wanted incorporated into a new child carrier. Zalkow Depo. 139, 173–75.

Defendants point to differences between their carrier and plaintiff's carrier. Defendants' child carrier is teal-colored with a black padded stripe and the frame is painted black, while plaintiff's carrier frame is unpainted. Defendants have submitted evidence that more than ninety-five percent of plaintiff's Kid Carriers produced have been a royal blue color. Def.Exh. N. Defendants maintain that their carrier is similar to Plaintiff's only with respect to functional features, and that "arbitrary" features such as colors, logos and the product names are "completely different." Zalkow Decl. ¶ 17. Tough Traveler's label and logo (the words "Tough Traveler" appearing over a mountain range) is sewn to the exterior back portion of the Kid Carrier about two inches from the bottom of the four-inch wide stripe. There is no evidence in the record that defendants have ever sold the 27–750 without the Outbound logo ("Outbound") sewn to the exterior back portion of its child carrier.

From 1985–1991, plaintiff allowed the retailer L.L. Bean to sell the Kid Carrier with the L.L. Bean label sewn to the exterior back portion of the carrier in place of the Tough Traveler label. The carriers sold by L.L. Bean were shipped with Tough Traveler hangtags attached, as well as a Tough Traveler product information book, but without the Tough Traveler label sewn anywhere on the carrier.

## III. Discussion

### A. Standard of Review

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). "When reviewing the evidence, the court must 'as-

sess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor.' " *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir. 1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991)). In order to defeat the motion, the nonmoving party must demonstrate the existence of facts establishing that there are material issues of fact for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

### B. Plaintiff's Lanham Act Claim

■ Section 43(a) of the Lanham Act provides protection of unregistered trademarks against any person who

in connection with any goods . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a); *Paddington Corp. v. Attiki Importers & Distribs.,* 996 F.2d 577, 582 (2d Cir.1993). This protection extends to trade dress. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 773, 112 S.Ct. 2753, 2759, 120 L.Ed.2d 615, *reh. denied,* 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992). Trade dress is " 'essentially [a product's] total image and overall appearance.' " *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995) (citation omitted). The focus in such cases is whether the "entire look of the [allegedly infringing] product" is "likely to cause consumer confusion as to the source of the product." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1042 (2d Cir. 1992).

■ Plaintiff seeks trade dress protection for the design and configuration of the Tough Traveler Kid Carrier. It is well established that trade dress may include "the design and appearance of the product as well as that of the container and all elements making·up the total visual image by which the product is presented to customers." *Id. See also Fabrication Enterprises, Inc. v. Hygenic Corp.,* 64 F.3d 53, 57 (2d Cir.1995).

■ To prevail in an action for trade dress infringement under Section 43(a), plaintiff must prove that its dress is distinctive of the source and that a likelihood of confusion exists between its product and defendants' product. *Knitwaves, Inc. v. Lollytogs, Ltd. (Inc.),* 71 F.3d 996, 1006 (2d Cir. 1995). Distinctiveness may be established by showing that a trade dress is either (1) inherently distinctive or (2) that it had acquired distinctiveness through secondary meaning. *Two Pesos, Inc.,* 505 U.S. at 769, 112 S.Ct. at 2757. Once these elements are established, a defendant may yet prevail by showing that the alleged infringement is in respect of "functional" aspects of the product. *See Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.,* 916 F.2d 76, 80–81 (2d Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991).

### 1. Inherent Distinctiveness

The standard test for whether a trade mark or trade dress is inherently distinctive is that developed in the context of word marks by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 11 (2d Cir.1976). In *Abercrombie,* the court classified words into four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Id.* Only those words falling into the latter two categories could be deemed inherently distinctive.

However, in *Knitwaves,* the Second Circuit declined to apply the *Abercrombie* test in so-called "product configuration" cases, where the trade dress consists of features of the product itself. *Id.,* 71 F.3d at 1007. Reviewing whether the "squirrel" and "leaf" designs on plaintiff's sweaters were protectable trade dress, the court noted that application of the *Abercrombie* classes to product features made "little sense." *Id.* It found, referring

to the statutory definition of trademark requiring that a person "use" or "inten[d] to use" the mark as a source identifier, 15 U.S.C. § 1127, that application of *Abercrombie* might result in protection of features "even though they were never intended to serve a source identifying function." *Id.* The court adopted, as its test, "whether [a product feature or design] 'is likely to serve primarily as a designator of origin of the product.' " *Id.* at 1008 (quoting *Duraco*, 40 F.3d at 1449). The court found that, "[a]s plaintiff's objective was primarily aesthetic, the designs were not primarily intended as source identification." *Id.*

Since that decision, several courts in the Second Circuit have applied the *Knitwaves* test in product configuration cases, and have uniformly found that the product design or feature did not serve "primarily" as a designator of origin. *See EFS Marketing, Inc. v. Russ Berrie & Co., Inc.*, 76 F.3d 487, 491 (2d Cir.1996) (troll dolls); *Banff Ltd. v. Express, Inc.*, 921 F.Supp. 1065, 1070 (S.D.N.Y.1995) (sweater designs); *New York Racing Assoc. v. Perlmutter Publishing, Inc.*, 959 F.Supp. 578, 581 (N.D.N.Y.1997) (racing horse design on souvenir items).

However, *Knitwaves* was criticized in *Krueger Int'l Inc. v. Nightingale, Inc.*, 915 F.Supp. 595 (S.D.N.Y.1996) on two grounds. First, the court found that the focus on "intent" imported the evidentiary requirements of secondary meaning, such as advertising and consumer surveys, into the analysis for inherent distinctiveness, thus making the latter redundant. *Id.* at 602. Second, the court interpreted *Knitwaves* as creating a false dichotomy between intent to create a pleasing or functional design and intent to create a design which served as a source identifier. In reality, the court argued, a manufacturer will typically intend a design to be both pleasing and source identifying. *Id.* at 606.

The Second Circuit addressed these criticisms in its most recent decision dealing with trade dress protection for product design, *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir.1997). While reaffirming *Knitwaves*, the court nevertheless appeared to reinterpret the appropriate test to be merely "whether the design was likely to be understood as an indicator of the product's source," no longer requiring the design to serve "primarily" as an indicator. *Id.* at 378. The court found that "[i]f *Knitwaves* forced courts to decide whether a manufacturer's purpose was to create either something of beauty or something indicative of source, ... the task would often prove impossible." *Id.* at 378 n. 3. The court thus appears to have moved from the either-or approach of categorizing designs as aesthetic/functional or source-identifying, and instead focuses on the capacity of a design to be source identifying independently of how well it serves other purposes.

The court reviewed the three-factor test for inherent distinctiveness applied in *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977), and found that the factors applied in that case were not inconsistent with *Knitwaves*, but instead, might, "in different contexts, be useful tools to assess whether a design is 'likely to be perceived as a source indicator.' " *Landscape Forms, Inc.*, 113 F.3d at 378 n. 3 (citation omitted). These three questions were "whether [the design] was a 'common' basic shape or design, whether it was unique or unusual in a particular field, [and] whether it was a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods." *Id.* However, the *Landscape* court looked as a general standard of inquiry to "whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin...." *Id.* (citing 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 8–13 (4th ed.1996)).

Additionally, the court expressly found that "a manufacturer's subjective intentions *may be* probative of whether its dress is likely to indicate product source," but that "objective considerations of the product and its similarity to others on the market will always be relevant and often decisive." *Id.* (emphasis added). The court thus clarified that intent is neither a necessary nor, generally, a critical factor in the

analysis. Rather, the objective capacity of the product configuration to indicate source within the relevant market is the court's principal concern.[1] Such a capacity can only be found from a sufficiently high degree of uniqueness within the relevant market.

Although these clarifications appear to relax the *Knitwaves* test in several respects, the court in *Landscape Forms, Inc.* also emphasized that the Lanham Act "must be construed in the light of a strong federal policy in favor of vigorously competitive markets . . . ," *id.* at 379, and that this policy is strongly implicated when "product designs or configurations are claimed as trade dress. While trademarking a generic term would create a monopoly in a necessary word or phrase, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Id.* at 380. A court should therefore review assertions of trade dress in product design with "caution." *Id.*

■ Plaintiff has provided some evidence of the state of the marketplace for child carriers, consisting of reviews and advertisements that display and describe various carriers available and several photos of competing carriers. *See* Gold Aff., Exh. E, Exh. K; Pl.Exh. 9; Gauss Affidavit and attached Exhibits. Taken together, the exhibits do suggest a distinctiveness in the Tough Traveler carrier configuration. Orientation of the zippers (from horizontal to an diagonal arc), the size and shape of the rear pouches, the presence and configuration of the stand (its roughly triangular shape as viewed from the rear) and the overall hinged-frame, the presence at the top of the carrier of "toy loops," the size and shape of the seat and the positioning of the straps all vary to a noticeable degree, and none of the carriers available in the evidence possess a particularly similar overall configuration of shape and features.

Considering the three *Seabrook* factors, it appears that many of these features by themselves would be "mere refinements" (e.g. two-toning, a zipper on a diagonal instead of curved or horizontal, the placement of loops on top instead of elsewhere); others appear to be common in the industry (many of the products viewed appear to include a carry pouch in roughly the same location at the lower rear exterior). However, the Second Circuit has noted that "[although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry." *Jeffrey Milstein, Inc.*, 58 F.3d at 32. Here, the overall appearance of plaintiff's combination of features is sufficiently unique that a rational trier-of-fact could conclude that it will automatically serve as a source identifier.

Defendants offer several arguments for why plaintiff's product configuration cannot be inherently distinctive. First, they argue that plaintiff has provided no evidence that the design was intended to indicate that Tough Traveler was the source of the product. However, as is evident from the preceding analysis of *Landscape Forms, Inc.*, plaintiff needn't make a showing of intent to demonstrate inherent distinctiveness. Nor does it need to prove that the trade dress actually indicates plaintiff as the source, only that the trade dress is sufficiently unique that customers viewing it for the first time will be likely to assume that any similar product seen in the future has come from the same source. *See Paddington*, 996 F.2d at 585 (distinctiveness is tendency to identify the goods sold as emanating from a particular, although possibly anonymous, source).

Defendants argue that advertisements and reviews emphasize the functional, not source-indicating, nature of the design, and that the willingness of plaintiff to have its product

---

1. On the issue of intent, the Court considers the plaintiff's willingness to allow its product to be sold under the L.L Bean label to argue strongly against a funding of intent that the design be a unique source indicator. Plaintiff notes that even these products sold through L.L. Bean carried with them hang-tags indicating that plaintiff was the true source. However, consumers generally throw away such tags, while the more prominent labels are permanently attached. Hanging tags could not be expected to provide source identification to anyone viewing the product subsequent to purchase. However, as stated above, such a finding should not bar a finding of inherent distinctiveness where a product configuration is likely to serve as a source indicator on the basis of its actual distinctiveness.

sold by L.L. Bean, with an L.L. Bean label instead of plaintiff's label, indicates that it was never plaintiff's "primary purpose" to have the design be a source indicator. Again, after *Landscape Forms, Inc.*, a court should not impose an artificial dichotomy between dress which is intended to be functional and dress which is source-identifying. Thus, evidence that the dress is functional does not demonstrate that it is not also distinctive.

Finally, defendants argue that the record does not provide any evidence that customers associate the design automatically with plaintiff. This argument would only be relevant to the issue of secondary meaning, which depends upon actual consumer perceptions rather than the uniqueness of the product. It is not relevant to inherent distinctiveness, which focuses on the objective uniqueness of the product design. From a consideration of the Kid Carrier's overall configuration of design elements, the Court finds that the evidence is sufficient to support a conclusion by a rational trier-of-fact that the Tough Traveler Kid Carrier has an inherently distinctive trade dress.[2]

### 2. Likelihood of Confusion

■■■■■■ The core issue in a trade dress infringement claim is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the

source of the goods in question." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979). To determine this issue, courts look to the eight non-exclusive factors described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See Merriam–Webster, Inc., v. Random House. Inc.*, 35 F.3d 65, 70 (2d Cir.1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1252, 131 L.Ed.2d 133 (1995). These factors include (1) the strength of the prior owner's mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood that the prior owner will bridge the gap, (5) evidence of actual confusion, (6) evidence of the junior user's bad faith, (7) the quality of the defendant's product, and (8) the sophistication of the relevant consumer. 287 F.2d at 492. Like the prongs of the *Seabrook* distinctiveness test, these factors are "merely tools designed to help grapple with the 'vexing' problem of resolving the likelihood of confusion issue." *Bristol–Myers Squibb Co.*, 973 F.2d at 1044 (2d Cir.1992) (citation and internal quotations omitted). The ultimate question of whether there is a likelihood of confusion is decided by a careful weighing of these factors, not a mechanical evaluation: the party with the most factors does not necessarily win. *Paddington*, 996 F.2d at 584 (citation omitted).

---

**2.** In an opinion by the Second Circuit issued at an earlier stage of this litigation, Judge Jacobs concurred in the court's decision to vacate a preliminary injunction on the grounds that plaintiff did not show a likelihood of success on the merits. *See Tough Traveler, Ltd.*, 60 F.3d at 969–71. He found that plaintiff's alleged trade dress consisted primarily of functional features, and that the arbitrary elements of the dress were not sufficient to receive protection for the whole dress, particularly where the most purely arbitrary feature, the content of the label, had not been duplicated. *Id.* at 971. Judge Jacobs was discussing not the determination of distinctiveness (part of plaintiff's prima facie case of trade dress infringement), but rather the defense of functionality.

The issue of functionality is of concern to this Court. Further, although distinctiveness and functionality are separate elements of trade dress infringement, there is some basis for importing a review of the functionality of plaintiff's alleged dress into a distinction analysis. *See* Hermene-

gildo A. Isidro, *The Abercrombie Classifications and Determining The Inherent Distinctiveness of Product Configuration Trade Dress*, 62 Brook. L.Rev. 811, 849, 850 (1996). The Court believes that the better course is to continue to treat these elements separately, as confusing them might implicitly shift the burden of proving functionality from defendant to plaintiff. In addition, the focus in distinctiveness is on the market as it exists, to determine which features have become common or expected. *See Landscape Forms, Inc.* at 378 n. 3. ("court must ask whether combination of elements *is* so unique, unusual or unexpected in *this* market"). Functionality, on the other hand, can apply to disallow protection even of elements which have not yet become commonplace, if they would provide an important competitive advantage. The case of *Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971 (2d Cir.1987), cited by Judge Jacobs as demonstrating the limitations of Tough Traveler's, is not to the contrary. That case was discussing the defense of functionality, not the element of inherent distinctiveness.

On summary judgment, a court's task is " 'to determine whether any reasonable trier of fact could conclude that confusion is likely.' " *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996). In making this determination, the court must resolve all factual questions with regard to the individual Polaroid factors in the non-movant's favor. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir.1996) (district court improperly resolved factual questions regarding two factors against non-movant on summary judgment). However, after doubts as to the facts as resolved in the non-movant's favor, the weighing of the *Polaroid* factors and the final determination of likelihood of confusion is an issue of law appropriately decided on summary judgment. *See Cadbury Beverages, Inc.*, 73 F.3d at 478 (balancing of factors on summary judgment motion is legal issue reviewed de novo); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir.1986) (application of undisputed facts to the issue of likelihood of confusion is legal issue which is appropriate for district court to resolve on summary judgment). *See also Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004–05 (2d Cir.1983) (weighing of factors is issue of law); *Paddington, id.* at 584 (same); *Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 491 (2d Cir.1988) (same). Therefore, on defendants' motion for summary judgment, the Court must resolve reasonable doubts regarding each factor in plaintiff's favor, before balancing the factors to determine whether there is a likelihood of confusion.

The "proximity" factor concerns whether and to what extent the two products compete with each other. *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir.1996). In the case of directly competing products, "proximity ... in the marketplace ... is necessarily answered in favor of the senior user, and another factor, the likelihood of bridging the gap [between the products], is not a relevant inquiry." *Bristol–Myers Squibb Co.* at 1044.

### 1) Strength of the Dress

The strength of a dress is determined by its distinctiveness, which, as noted above, is "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *Paddington,* 996 F.2d at 585. Plaintiff has not provided sufficient evidence to support a conclusion that its dress is strongly distinctive. Product configuration in general suffers a presumption, not present with other sorts of trade dress, that customers will not typically rely upon it as an indication of source. The court in *Knitwaves* observed that,

[a]s a practical matter, ... it is less common for consumers to recognize the design of a product or product feature [as opposed to packaging features] as an indication of source. Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods.

*Knitwaves,* 71 F.3d at 1008 (quoting Restatement (Third) of Unfair Competition, § 16 cmt. b) (alterations in original). *See also Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1001 (2d Cir.1997) (quoting same). Thus, plaintiff must overcome this factual presumption to demonstrate that its dress is strongly distinctive.

This conclusion is not at odds with the Court's finding that a reasonable person could conclude that the dress is distinctive. After *Landscape Forms,* distinctiveness only requires that the plaintiff prove that one of the aspects of the trade dress is as a potential or actual source indicator, regardless of whether it might also serve aesthetic or functional purposes. To demonstrate a strong dress, however, a plaintiff must show that the "dress is such that it seems to the consumer *uniquely* intended to indicate a product's source...." *Paddington Corp.,* 996 F.2d at 585. Product designs, particularly where, as here, most of the specific elements of the design serve some functional purpose, are highly unlikely to be viewed as purely for the purpose of source indication.

The negative presumption can be overcome in a case where a design is particularly distinctive. In *Kompan A.S. v. Park Structures, Inc.,* 890 F.Supp. 1167 (N.D.N.Y.1995), the court found that the trade dress of playground equipment was strong where the

dress was "very distinctive." *Id.* at 1175. However, the court had earlier concluded that "no other manufacturer combines even the generic design elements in ways similar to [the plaintiff.]" In this case, many of the individual design elements are configured in similar ways in other carriers; it is the overall configuration which is unique. The Kid Carrier's trade dress cannot be considered "very" distinctive on the basis of its inherent qualities.

■ A court may also consider the presence of secondary meaning in evaluating the strength of the trade dress. *Paddington,* 996 F.2d at 585 (citation omitted). Evidence of secondary meaning may include "advertising expenditures, consumer studies linking the mark to the source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and length and exclusivity of the mark's use." *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985) (citations omitted).

■ Plaintiff's evidence, although voluminous, does not provide a basis for finding that its mark is strongly indicative of the source. First, plaintiff has provided no consumer studies to demonstrate directly the state of the consumer's view. With regard to the advertisements and "unsolicited material" plaintiff presents, the Court notes initially that secondary meaning must be shown as of the date the defendants entered the market. *See Saratoga Vichy Spring Co., Inc., v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980). Thus, materials that were published after 1993 cannot be offered in support of a claim of secondary meaning. A review of the record finds that much of the unsolicited material offered by plaintiff came after 1993 and must be excluded from consideration. *See* Pl.Exh. 6.

The remaining material plaintiff has brought to this Court's attention is not evidence of strong recognition. Many of the news stories and reviews do not display the Kid Carrier or describe the design elements in which Tough Traveler claims trade dress protection. Of those materials that do display the carrier, most provide only an obscured view of it from which little of the trade dress can be made out.

In addition, the element of "exclusivity" is critical to any finding of secondary meaning, since the plaintiff must demonstrate that consumers identify the dress with a *single* source. *See EFS Marketing, Inc., v. Russ Berrie & Co.,* 76 F.3d 487, 490 (2d Cir.1996). In this case, there was an absence of "exclusivity" between 1985 and 1991, the period during which L.L. Bean sold the Kid Carrier with the L.L. Bean label affixed to the back exterior of the pack, in place of plaintiff's own trademark. The Court notes that two of the product reviews offered by plaintiff advertise the L .L. Bean model without reference to plaintiff. *See* Pl.Exh. 8. An additional product review displays what appears to be the L.L. Bean licensed carrier, again without discussion of its origins as a Tough Traveler product, although another Tough Traveler carrier is discussed in the same article. *See* Zalkow Decl.Exh. E. In light of the absence of exclusivity during a period of less than two years prior to defendants' entry into the market and the lack of any direct evidence to the contrary, there is no reasonable basis for finding that plaintiff's dress is a strong source indicator because of secondary meaning. Plaintiff has therefore failed as a matter of law to overcome the presumption that its dress is weak.

2) *Similarity of dress*

■ The issue to be considered in this factor is "whether the similarity between the two trade dresses will contribute to consumer confusion." *Bristol–Myers,* 973 F.2d at 1046. The analysis of similarity does not focus on similarity between particular elements of the plaintiff's and defendants' dress, but on whether the products create the "same overall impression." *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 492 (2d Cir.1988) (citation and internal quotations omitted). *See also LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 79 (2d. Cir.1985) (it is the "combination of features as a whole . . . which must determine whether the competing product is likely to cause confusion. . . ." (citation and internal quotes omitted)).

Notwithstanding the differences in the color of the frame, and other differences indicated by the defendants (some of which are a matter of dispute), the photographs clearly demonstrate that the two carriers bear a very striking visual similarity in their overall appearance. However, the tendency of the similarity to confuse must be assessed in light of the presence of labels placed on the rear of the products bearing the trademarks of the respective companies.

The court in *Bristol–Myers* held that "[t]he presence and prominence of markings tending to dispel confusion as to the origin ... of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed, it can go far towards eliminating any possible confusion." *Id.* at 1046. However, "[t]he appearance of the junior user's name does not in all cases eliminate the possibility of consumer confusion." *Id.* In particular, the prominence of the label as a feature of the product is relevant to the determination. *Id.*

Plaintiff correctly notes that the carrier labels are not as prominent as were the labels in the *Bristol–Myers.* However, a label does not need to be the dominant feature to affect the likelihood of confusion. The court in *Landscape Forms, Inc.* found that labels placed on outdoor furniture such as benches contributed to making confusion less probable. 113 F.3d at 193. Similarly, labels placed on the lower corner of stereo speaker equipment were found to "go[ ] far to eliminate confusion of origin." *See Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 309 (1972).

Courts have found such markings inadequate in certain specific circumstances: where arbitrary elements of packaging or elements of a trademark have also been duplicated, *see LeSportsac, Inc.,* 754 F.2d at 79 (defendant duplicated repeating ellipse containing logo), *and Banff, Ltd.,* 841 F.2d at 492 (presence of defendant's name did not offset similarity of trademark "B Wear" to plaintiff's trademark "Bee Wear"); where the label would not have been visible to the ordinary consumer, *see Krueger Int'l, Inc.,* 915 F.Supp. at 607 (chair's label insufficiently

prominent primarily because the label was placed underneath the product, in a position where consumers were unlikely to see it); and where the product was of such a large size that the label would be overlooked, *see Kompan,* at 1175 (three by two inch label was too small in comparison to size of playground equipment).

In this case, the parties' trademarks have been placed on labels several inches across that are positioned at the upper rear exterior section of their carriers, so that the label is visible at all times. Further, no part of Tough Traveler's trademark has been copied in defendants' logo, and the carriers themselves are not of such a size that the labels are likely to be overlooked by consumers. The considerations that might reduce the label's effectiveness are thus not apparent here, and the danger of confusion from the design similarity is significantly reduced.

3) *Actual Confusion*

Evidence of actual confusion is a strong indicator that a likelihood of confusion exists. *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 170–71 (2d Cir.1991). Plaintiff offers as evidence of actual confusion one individual's name and address along with the allegation that this individual was confused as to the source of the Outbound carrier. *See* Pl.Resp.Def.Supp. Interrogs., ¶ 131. In addition, plaintiff points to testimony by Nancy Gold in which she alleges that five or six Canadian retailers indicated confusion. *See* Pl.Exh. 15. Defendants object to all of plaintiff's evidence on the grounds that it is inadmissible hearsay.

Hearsay is defined in the Federal Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Ev. 801. It is clear that testimony as to another person's statement concerning his confusion, offered to prove the existence of that confusion, is hearsay unless it falls within one of the exceptions to the hearsay rule. At least one court has concluded that such testimony is exempt from exclusion under the exception for statements

expressing a state of mind, such as confusion. *See Frank Brunckhorst Co. v. G. Heileman Brewing Co.*, 875 F.Supp. 966, 980 fn. 22 (E.D.N.Y.1994). However, that exemption cannot be applied in this case, as it covers only utterances of a *then-existing* state of mind. There is no evidence that, here, the declarant' statements were made contemporaneously with their confusion.

Further, it is not clear that plaintiff even alleges an instance of actual confusion. Merely providing the name and address of an individual is wholly conclusory, and inadequate to provide this Court with any means of determining the existence, nature and context of the confusion. Further, in Ms. Gold's testimony, she stated only that there were "maybe" five or six retailers confused. *See* Pl.Exh. 15. When prompted for further instances of confusion, Ms. Gold related:

> I was in a store in Canada . . . and had a salesman, who did not know we were from Tough Traveler, show us the Outbound next to the Touch Traveler and said—he said you can—he showed us the features, showed us the Tough Traveler, and he said, "If you want to spend less, you can buy the Outbound. It's copied, it's a copy of the Tough Traveler."

*Id.* While this encounter does support the conclusion that the Outbound carrier is being sold as a cheaper substitute for the Tough Traveler carrier, it does not suggest that the retailer had any confusion about the distinct origins of the two carriers. To the contrary, it suggests that this retailer both knew that the products were made by different companies and took pains to point that out to customers. Thus, even were this Court to consider such hearsay admissible under a judicially-crafted exception for anecdotal evidence of actual confusion[3], plaintiff's evidence would not establish any actual confusion in the marketplace.

Courts have not required plaintiffs to present evidence of actual confusion in order to prove a likelihood of confusion. *Coach*

*Leatherware Co.*, 933 F.2d at 170–71. However, where the products have been in competition for a substantial period of time, the absence of such evidence is considered "a strong indicator that the likelihood of confusion is minimal." *Plus Products*, 722 F.2d at 1006 (presumption applied after three-year period). Here, plaintiff's and defendants' products have been in direct competition from at least 1993 to the present. The absence of any admissible evidence on actual confusion is therefore a relevant factor.

### 4) *Bad Faith*

"Bad faith" on the part of the defendant has traditionally weighed heavily in the plaintiff's favor in whether likelihood of confusion exists, on the assumption that, "if [the junior user] adopts his designation with the intent of driving benefit from the reputation of the trademark or trade name, his intent may be sufficient to justify the inference that there is confusing similarity. Since he was and is intimately concerned with the probable reaction in the market, his judgment manifested prior to the controversy is highly persuasive." *Perfect Fit Industries, Inc., v. Acme Quilting Co., Inc.*, 618 F.2d 950, 954 (2d Cir.1980) (quoting Restatement of Torts, § 729 cmt. f (1938)) (internal quotations omitted).

Nevertheless, the importance of bad faith as a factor has more recently been reduced. Just as the presence of intent is not controlling in the determination of whether there is inherent distinctiveness, as discussed previously, the presence of bad faith does not control in the determination of whether there is a likelihood of confusion. *Centaur Communications v. A/S/M/ Communications*, 830 F.2d at 1217, 1228 (2d Cir. 1987). " 'If a comparison of the other objective factors reveals no fair jury issue concerning likelihood of confusion, then intent to copy [the trademark or trade dress], even if found from the proffered evidence, would not

---

**3.** Courts have implicitly recognized such an exception with regard to the use of surveys and opinion polls to demonstrate actual confusion. *See Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 557 (S.D.N.Y.1991); *Nestle*

*Company v. Chester's Market, Inc.*, 571 F.Supp. 763, 772–773 (D.Conn.1983). However, there is no established exception for anecdotal evidence and no apparent reason to create one.

establish a Lanham Act violation.'" *Id.* (quoting *Warner Bros. v. American Broadcasting Co.,* 720 F.2d 231, 246–47 (2d Cir.1983)).

The most recent decision on the issue of "bad faith" has additionally clarified that proof that a defendant has copied is not proof that the defendant did so with "bad faith", i.e. the intent to confuse:

> It cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving or confusing consumers as to the source of the product. *See* Andrew C. Finch, *When Imitation is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement,* 63 U.Chi.L.Rev. 1243, 1255 (1996). A defendant who copies his competitor's trade dress may have valid reasons, wholly apart from a desire to confuse consumers, for doing so. *See id.* (noting that copying may be motivated by belief that trade dress is functional or generic, or by belief that copying is the best way to inform consumers that a generic product is a lower-priced alternative to the competitor's products). Indeed copying in order to market a functionally equivalent alternative product might well benefit consumers, which is one of the aims of the Lanham Act.
>
> Hence, in the absence of evidence, apart from proof of copying, that the defendant sought to confuse consumers, bad faith should not be inferred simply from the fact of copying. On the other hand, if there is additional evidence that supports the inference that defendant sought to confuse consumers as to the source of the product, we think the inference of bad faith may fairly be drawn to support a likelihood of confusion determination.

*Fun–Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993, 1005 (2d Cir.1997).

In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989), the Supreme Court expressed a similar concern with distinguishing a good faith desire to copy unprotected designs from a bad faith intent to confuse customers as to origin:

> [T]he plaintiff has the right not to lose his customers through false representations that those are his wares which in fact are not, but he may not monopolize any design or pattern, however trifling. The defendant, on the other hand, may copy plaintiff's goods slavishly down to the minutest detail: but he may not represent himself as the plaintiff in their sale.

*Id.* at 157, 109 S.Ct. at 980 (quoting *Crescent Tool Co. v. Kilborn & Bishop Co.,* 247 F. 299, 301 (2d Cir.1917) (alteration in original)).

The record supports the conclusion that defendants intentionally copied the design of plaintiff's carrier. Aside from the similarity of detail, plaintiff presents a letter, allegedly from Sandie Klassen, "Product and Packaging Coordinator" for Outbound Products, to a Korean manufacturer, stating in relevant part:

> We enclose a further six new items which we wish to develop with your assistance.... Tough Traveler Kid Carrier—In developing this item you would need to determine the mould cost for the frame, and also to avoid the possibility of any conflict over patent rights it would be permissible if not advisable for your version to be slightly different in construction.... If it is possible to duplicate this baby carrier and mould cost is not prohibitive, a counter sample in our usual medium blue high density nylon with navy polyester/cotton would be required.

Pl.Exh. 1. The expressed intent to "duplicate" the carrier, and the admission that defendants permitted only "slight" changes in construction, amply demonstrate that defendants copied the design of plaintiff's carrier.

Beyond the strong evidence of copying, however, there is little to suggest bad faith in this case. The letter mentioned above provides some support, inasmuch as a trier-of-fact could conclude that even "slight[ ]" changes were "inadvisable" precisely because of a desire to convince consumers that the Outbound product was really a Tough Traveler carrier. Pl.Exh. 1. However, the letter is ambiguous in this respect, for, as the court acknowledged in *Fun–Damental Too, Ltd.,* a desire to represent one's product as a "knock-off" (informing customers that a low-

er priced-alternative with similar functionality is available) is not the same as the desire to misrepresent the product's origin. The presence of a prominent label bearing the parties' trademarks on the product and the lack of similarity between the Tough Traveler trademark and the Outbound trademark argue against any finding of a bad faith intent to confuse. In sum, there is serious doubt as to whether bad faith existed in this case. Nevertheless, the Court is required to resolve such doubt in plaintiff's favor, and therefore this factor, while not conclusive, weighs in support of a likelihood of confusion.

### 5) *Quality*

Plaintiff has presented evidence, disputed by defendants, that the defendants' carrier is of inferior quality. While such evidence is certainly probative of harm to the good will associated with plaintiff's alleged trade dress, *see Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir.1987), it works against plaintiff in this analysis, insofar as it decreases the similarity of the products, and thus the likelihood of confusion. *See Banff, Ltd., id.* at 492; *Centaur Communications v. A/S/M Communications*, 830 F.2d 1217, 1228 (2d Cir.1987) (lack of marked difference in quality supports the inference that the products emanate from the same source). However, unless the differences were likely to be "marked", *id.*, it is not appropriate to consider this factor as weighing heavily for either party.

### 6) *Sophistication*

Generally, the more sophisticated the consumers of the product are, the less likely it is that similarities in trade dress will result in confusion concerning the source and sponsorship of the product. *See Bristol–Myers Squibb Co., id.* at 1046. The focus of this factor is on how the nature of the purchasers or the nature of the purchase will affect the likelihood of confusion. The purchasers of carriers, as a group, do not appear to have any special qualifications beyond the likelihood of being parents. However, a trier-of-fact must also take into account whether particular care will be taken in making the purchase due to cost or the importance of the item. *See Bristol–Myers Squibb Co.*, 973 F.2d at 1046–47 (greater likelihood of confusion where cold medicine was inexpensive and "low-involvement" item). The carriers are relatively expensive and will be used to carry children, suggesting the product will not be an "impulse buy." *See Schieffelin & Co. v. Jack Company of Boca, Inc.*, 850 F.Supp. 232, 250 (S.D.N.Y.1994) (no record that shoppers would impulse buy a high-priced bottle of popcorn). Furthermore, the importance of matching the functional characteristics of the carrier to the parent's needs is apparent in the literature provided by plaintiff:

> Whatever your intentions are, it is wise to look at many carriers closely and try some of them on to test the fit. According to many parents who are accustomed to taking their children on outings, both children and parents do best when they are most comfortable and they look for gear that can adapt to the needs of the growing child.

See Pl.Exh. 6, "kid's korner." There is every reason, therefore, to expect that consumers will exercise care in their selection.

Some courts have suggested that sophistication might actually increase confusion where the trade dress of the products are particularly similar. *See, e.g., Centaur Communications, id.* at 1228. The origin for this theory appears to be *Grotrian, Helfferich, Schulz, Etc. v. Steinway & Sons*, 523 F.2d 1331, 1341 (2d Cir.1975), in which the court found that evidence that care would be taken in the purchase did not eliminate the likelihood of confusion where buyers might believe that the junior user had reproduced the dress pursuant to some form of licensing agreement with the senior user. This theory does not reverse the normal effect of sophistication, but merely suggests why it might not be determinative in certain contexts. Likewise, the court in *McGregor–Doniger Inc.*, 599 F.2d at 1137, found only that "where the products ... and marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." Courts should therefore not presume that sophistication will lead to increased confusion where there is similarity. Moreover, in absence of some evidence

that a relationship between the parties exists, to assume that consumers are likely to suppose the existence of such a relationship is overly speculative. *See Grotrian* at 1342, n. 20 (likelihood, not mere possibility, that consumers will suppose a connection is required).

The only evidence in the record related to licensing is the undisputed fact that plaintiff licensed its Kid Carrier to L.L. Bean, who then sold the carrier under its own label, with hang-tags and an information booklet that indicated its true origin. This fact provides at least some support for a finding that consumers might suppose such a relationship between plaintiff and defendants exists, since the relationship with L.L. Bean establishes a precedent for the practice that could have been repeated. However, a trier-of-fact would still be required to conclude (1) that an appreciable number of consumers were aware of the relationship between Plaintiff and L.L. Bean, despite both the evident failure of the reviewers of the L.L. Bean product to note the connection and the limitations of the hang-tag as an identifier, and (2) that those same consumers would then assume, while viewing the Outbound carrier that it was the product of a similar licensing arrangement. This chain of speculation suggests that, out of the full set of consumers who will take care in the purchase of their child carrier, only a few are likely to mistakenly assume that the Outbound carriers are licensed by Tough Traveler. Thus, the factor of sophistication must, to some extent, weigh against plaintiff.

### 7) *Overall Likelihood of Confusion*

■ Plaintiff's burden is to show that the confusion of numerous purchasers as to the origin of the product is likely. *See Gruner+Jahr USA Publishing, a Division of Gruner+Jahr Printing and Publishing Co., v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir.1993). Considering all the relevant factors, and allowing for reasonable inferences in plaintiff's favor on disputed factual questions, the record does not support a finding that an appreciable number of prudent consumers are likely to be confused. The danger of confusion is significantly reduced by the combination of a likelihood of care in the purchase of the product, a weak trade dress and a prominent label bearing the parties' trademarks, particularly where it appears from the submissions of the parties that advertisements and reviews, in discussing the carriers, invariably reference the relevant trademark when naming the product. *See,* e.g., Gold Aff.Exh. E ("The Tough Traveler Kid Carrier features a bucket seat. . . .") The absence of evidence demonstrating actual confusion, in light of the period of time for which the products have been in competition further supports the conclusion that while plaintiff may have lost sales due to the reproduction of its design by a competitor, it has most likely not lost sales, and mostly likely will not lose sales, due to a mistake of origin. A conclusion that defendants acted in bad faith does not outweigh these considerations. Accordingly, defendants' motion for summary judgment on the claim of trade dress infringement shall be granted.

### C. *The New York common law unfair competition claim*

■ Defendants also move for summary judgment on this claim. Plaintiff cross-moves for summary judgment. "[T]he essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc.,* 58 F.3d at 34 (alteration in original; citations and internal quotation marks omitted). a plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief. *Id.* at 35. In addition, there must be a showing of bad faith. *Id.*

■ Likelihood of confusion is judged in an unfair competition claim in the same manner as a Lanham Act claim. *See Bristol–Myers Squibb Co.,* 973 F.2d at 1048 (affirming application of Polaroid factors to unfair competition claim); *Horn's, Inc., v. Sanofi Beaute, Inc.,* 963 F.Supp. 318, 328 (S.D.N.Y.1997). The conclusion that a reasonable trier-of-fact could not conclude that there is a likelihood of confusion in the Lanham Act claim applies here with equal

**218**

force. Summary judgment is therefore granted to defendants.

Accordingly, it is hereby

ORDERED that defendants' motion for summary judgment on all claims is GRANTED; and it is further

ORDERED that plaintiff's motion for summary judgment on the New York common law unfair competition claim is DENIED; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.